### JOHN E. PALMER *vs*. ANN CROSS et al.

The act of the legislature of 1822, respecting the title of personal property, and requiring the deeds thereto to be recorded in the county where the property is, (How & Hutch, 344,) does not apply to conveyances of personal property, made prior to the passage of the act.

Without some statutory provision, registration of titles to personal property is not required.

The statute of frauds, making possession for three years vest the title to personal property, does not apply, unless the possession has been continued for three years *in this State*.

A married woman stood by and suffered without objection, certain slaves owned by her, as her separate property, to be valued for her husband and in his presence, with a view to *his* taking stock in the Northern Bank (of Mississippi) upon a mortgage of the slaves : *Held*, that her conduct was not such as would divest her of her property.

Whether a married woman can be deprived of her separate personal estate in any other mode than the one prescribed by the instrument of settlement.   *Query ?*

M. in the year 1808, in Virginia, settles certain slaves upon her daughter, during her life—and after her death, upon her children, by deed ; which is recorded in the proper county in Virginia, in about eighteen months after its execution. The parties reside in the same place until 1835, when they moved to Tennessee, and in 1836, they moved to this State.   In the year 1838, the husband of the donee dies ; the deed of settlement has never been recorded in this State : *Held*, that the property conveyed by the deed of settlement was not liable to the husband's debts.

THIS case is brought by appeal, from the district chancery court at Carrollton—the Hon. Joseph W. Chalmers, vice chancellor.

The complainants below, who are defendants in this court, Ann Cross, in her own right, and as the natural guardian of John Cross, James Cross, Mary Cross, and Louisa Cross, minor heirs of Oliver Cross ; and Robert T. Cross, Fleming Cross, Richard Cross, and David Cross, in their bill, averred that Ann Michie, on the 17th day of March, 1808, conveyed four negroes and their increase to trustees for the benefit of the complainant, Ann Cross, for her life, and at her death, for the children she then had, and those she might afterwards have.   That she was the

daughter of the donor, and that the other parties, complainants, were children of herself and Oliver Cross, to whom she was married at the time of the settlement. That this deed was duly recorded in Louisa county, Virginia.

The bill then averred that Mrs. Michie, by her last will and testament, duly probated and recorded in Louisa county, Virginia, gave three other slaves to the complainant, Ann, upon similar terms and conditions to those limited in the settlement. That the slaves conveyed by the deed and will were, in the year 1836, brought to this State. That Mrs. Ann Cross gave notice to divers persons of her title to said negroes, and that it was matter of notoriety among her neighbors.

The bill further averred that Oliver Cross died in the year 1838, and, by his last will, admitted that he had no title to the negroes claimed by the complainants ; but that John E. Palmer, the executor of the last will and testament of said Oliver Cross, having obtained from the probate court of Carroll county, an order to sell the personal estate of his testator, had given notice that he would sell, as portion of that personal estate, the negroes claimed by the complainants. The bill prayed for a perpetual injunction, &c.

The deed of settlement was made an exhibit to the bill—was signed and sealed on the 17th day of March, 1808, and acknowledged on the 11th day of September, 1809.

The will of Mrs. Michie was also made an exhibit.

The answer of Palmer denies all notice of the title of the complainants, and demands the fullest proof—shows himself a creditor, to a considerable extent, of Oliver Cross—admits that he had procured the order of sale, and states, among other things, that Oliver Cross, in his lifetime, claimed and exercised ownership over the negroes conveyed by the deed of settlement, but disclaimed the ownership of those conveyed by the will. That Mrs. Ann Cross had been, by will of Oliver, appointed co-executor with himself, and had herself taken out letters testamentary, and had rendered to the probate court a schedule of the property belonging to her husband's estate, together with the appraisement of it; and in that schedule were included the ne-

groes conveyed by the deed of settlement. That Oliver Cross, in his lifetime, had had the negroes in controversy appraised, to take stock in some of the banks, with the knowledge and consent of the complainant Ann.

It is not deemed material to notice the other portions of the answer, as they had no weight in the decision of the case.

The depositions of various witnesses were taken in Virginia, who identified the negroes in controversy, by name, age, and character, with those conveyed by Mrs. Michie to the complainants, in Virginia, and brought by the latter to Mississippi.

The depositions also confirmed the statements of the answer with reference to the schedule and appraisement of the negroes, for Mrs. Ann Cross, as portion of her husband's estate, and also the valuation of the negroes, in the presence of Mrs. Cross, in the lifetime of Oliver Cross, in his presence, for stock to be taken in McEwing's bank, and that Mrs. Cross made no objection to the valuation, and set up no claim to the negroes.

The depositions in other respects are not important.

The vice chancellor, upon final hearing, perpetuated the injunction prayed for by the bill, and the defendant, Palmer, appealed to this court.

*E. C. Wilkinson*, for appellant.

The question of law which presents itself the most naturally and conspicuously upon the facts of this case, is one of statutory construction—the proper construction of our recording acts. I shall contend that the question has never been adjudged or presented until now ; and that in the consideration of it, we are to seek for the meaning of the 4th, not the 3d section of the recording act. The person claiming title to this property under the deed, permitted a person in whose possession it was, to remove with it out of the State of Virginia into the State of Mississippi ; and the deed was not recorded in the county to which it was removed, within twelve months after such removal. See Howard and Hutchinson's Digest, p. 344. The circumstances of the case take it entirely out of the range of the cases reported in 5 Cranch, 5 Randolph, and in 4 Yerger's Reports. In the

two first of these cases it appears that the forum, where the creditor attacked the conveyance, was the place where the deed was executed, and where the property remained. In the last, the property was removed from Virginia to Tennessee, but the decision was consistent with the other two, because in Tennessee there is no statute like the 4th section of our recording act.

What, then, is the proper construction to be given to the 4th section of our recording act? Can it be distinguished from that already given to the 3d section of it by the cases cited? That they may be, and should be, distinguished and different in their meaning, is the proposition I present for debate. This deed is void as to Palmer, he being a creditor of Oliver Cross; and the deed never having followed the property (at least record evidence of it) according to the provisions of the 4th section, as to what creditors is it void, if not as to Palmer? The terms of the statute are comprehensive enough to embrace all creditors whomsoever; but we do not contend for this interpretation—we admit that it does not mean all creditors in *rerum natura*—all creditors of every body; but it does not mean alone creditors of the grantor, Mrs. Michie. Is it possible that the creditors of any grantor can be deceived by the removal of property from one State or county even, to another? The creditors of the grantor may be easily misled when the property remains within the vicinage of the grantor, after the conveyance—and in this view, the cases from Tennessee and Virginia are right. But it is impossible that the subsequent creditors of the grantor can be misled, deceived, or in any way injured, by the removal of the property after the execution of the conveyance. The 4th section, then, does not mean the creditors of the grantor, but it means creditors whose interests may be injured by setting up the unrecorded conveyance. It means the creditor who has trusted the person in whose possession the property was, upon the faith of that property—and this was the purpose and object of the legislature, since none other approaching rationality can be given. Now it is possible that in passing the 3d section, the legislature may have had in view the creditors of the grantor, and none other—and without the enactment of the 4th

section, it is also possible that the 3d might have governed this case.    It may be proper enough to confine the construction to the creditors of the grantor, when there has been no removal of the property, so that the 3d section could apply.    For when the property remains in the same county where it was conveyed, parties subsequently dealing with each other in respect to it, can, by inquiry, ascertain its exact condition.    If the property conveyed be personal property, there most generally is a change of possession—and, in point of fact, the change of title is always matter of general notoriety in the county where the convey- ance is executed—unless the transfer be studiously concealed, which would render it fraudulent and invalid as to creditors. There may be reason, therefore, for the interpretation which has already been given to the 3d section ; but the court is now call- ed upon to construe the 4th, which is a field entirely untrodden, without a precedent to guide, or a single dictum (as far as I can discover) to indicate the course.    It is the obvious mischief in- tended to be remedied by the legislature, in framing the 4th section, (a mischief and evil altogether different from that which prompted the passage of the 3d section,) added to the certainty (perfectly clear) that the subsequent creditors of the grantor, can, in no case, be injured by a removal of the property—that we rely on, as reasons, to incline the mind of the court to the view we have taken.

Upon the most familiar of all rules of construction, the court, " *ut res valeat*," is bound to give the section I am considering operative effect in some way.    The act is by no means insensi- ble, and admits of construction in some way.    Now, I ask, to what creditors will you apply it, if not to the creditors of the person removing with the property ?    The mischief intended to be guarded against, is, by this construction, fully remedied—and I have already shown, or endeavored to show, that there can be no reason for its application to any other class of creditors.    The statute, then, must either be without meaning, or it must mean the creditors of the person removing with, and remaining in pos- session of, the property.    I think it would tax, with some severi- ty, the intellect of any man, to imagine a case where the credit-

ors of a man, who had conveyed his property by a deed—not voidable for fraud—had afterwards been deceived, hindered, delayed of their dues, or in any way injured by the removal of the property conveyed. On the other hand, it is easy to imagine much injury to the creditors of the person removing with the property, if the construction contended for is not given to this statute. The legislature considered it a fraud upon this latter class of creditors, in the person claiming title, to permit any person to remove with the property, without following the property within twelve months, with constructive notice of his title, by a public record of it. It may be said, perhaps, that Mrs. Cross, and not the trustees, was the person claiming title to the property at the time of its removal. If so, she could either have prevented the removal by suit, or she could have followed the property, with a record of her title to it. This was the duty either of herself or of the trustees for her benefit. It is immaterial for our purpose upon which the law imposes it. If it was her duty, she cannot complain of the consequences of its neglect. If it was the duty of her trustees, (as is our belief,) we should not be held responsible for their breaches of trust or neglect of obligation.

Let us examine it a little more particularly. Who was the person " claiming title under the act ?" The trustees, undoubtedly, for the benefit of Mrs. Cross. Who was " the person in whose possession such property was ?" Oliver Cross, and none other. Surely not Mrs. Cross, for the deed confers upon her no such power; it is simply a conveyance to the trustees for her own benefit. She could not be in possession of the property, being *sub viri potestate*—and her possession being regarded by the law as that of her husband. Oliver Cross was in possession, then, of the property, and he " removed with it," in the language of the statute, and the very evils which the law intended to provide against, arose afterwards as natural and almost necessary consequences.

There is a case in 13 Peters which will probably be pressed upon the attention of the court by adversary counsel. It is not in point; because in the District of Columbia, to which the

property was removed, there is no such law in force as the 4th section above commented upon. But the protection extended to the wife by this decision, in regard to property circumstanced as that was, is pushed to the uttermost verge of consistency and reason. It is extremely difficult to reconcile the doctrine of this case with the clearly established principle upon this subject, as published by Story. See 1st vol. Story Equity, § 385. 6 Vesey, 180. It does appear to me, that if ever there is a case which makes it necessary for a *feme covert* to apprise those about to deal with her husband, in respect of property, in his apparent ownership, of her right and claim thereto, it is when such property has been removed hundreds of miles, from another and a distant State, by an emigrant, wanting credit for the land with which to make the labor of that property productive, or, as in this very case, wanting credit for the necessaries of life to subsist this property upon until he could reap the avails of their manual labor.

Upon this view I am willing to rest the case—one more discursive and elaborate, however, will be taken by my associate. I repeat, that I do not think it necessary to question the decisions heretofore made upon cases similar to this, in every thing, but the law that governed them. I cannot refrain from one remark, however, in regard to those cases. There were luminous and strong dissenting opinions pronounced in all of them—in one of them (that in which a member of this court bore so distinguished and successful a part) two of the judges dissented, and the case in Virginia contradicted a previous decision of the same court. (Reported in 2 Call.)

Should this position be pronounced untenable, there is yet another (not involving the merits of this cause it is true) which is decisive of the matter in our favor—neither the deed nor the will are proven. The certificates annexed to them do not prove them. They are not records within the meaning of the act of congress, nor provable as such. If these instruments are not proven—Mrs. Cross showing no title to the slaves, and they having remained so long in the possession of her husband—they are his absolutely, and liable for his debts.

*A. L. Baine,* on the same side.

1. The bill is defective, because the trustee in the deed of trust is not a party. Story's Equity Pleading, § 207, 208, 209, et seq. Cooper's Plea. 34. Mitford's Eq. Plea. by Jeremy, 176, 179. 1 Sim. & Stuart, 105. And this defect may be taken advantage of at the hearing. 2 Johns. Ch. R. 238.

2. Again we say, that the complainants, both adult and minor, cannot be in a better situation, than if under the same circumstances, the insolvency of Oliver Cross, they were insisting for a decree against his use and possession of the estate ; or if he were insisting for an allowance for maintenance. In either case they would be compelled to account to him for their own maintenance and education, and the care and rearing of the negroes from 1808. And this, without regard to his circumstances; especially, then, will it be so when Oliver Cross is ' insolvent. 3 Vesey, Jr. 730–732. 5 Ib. 194–195. 6 Johns. Ch. R. 566. 4 Johns. Ch. R. 100. 2 Johns. Ch R. 638. 4 Mass. 208.

Hence, as the bill discloses the want of proper parties, and that they have mistaken their case, they must go out of court. " It is a general rule, if a demurrer would hold to a bill, the court, though the defendant answers, will not grant relief at the hearing." Story's Eq. Plead. § 447. Mitford's Plea. by Jeremy, 107, 108, and cases cited.

3. We lay down the law to be, that if one sees another, (or knows of it) about to deal in a matter of interest, and by his silence, or by the suggestion of a falsehood, or by any neglect or omission, or any other act, mislead the person so about to deal, then he shall make good the loss occasioned by his fraud —either actual or constructive. 1 Story's Eq. § 191, 384, 385, 386. " And there can be no material difference between an express misrepresentation, and one that is naturally or necessarily implied from circumstances." Story's Eq. § 384, 385, 386. Fonblanque, Eq. b. 1, ch. 3 and 4, notes (m.) and (n.) Sugden on Vendors, Ch. 16. *Stans & Brooks* v. *Barker.* 6 John Ch. R. 166. *Wendell* v. *Vanrensaeler,* 1 Johns. Ch. 344. Fonblanque, Eq. p. 136, 137. 5 Johns. Ch. R. 184. 1 Paige, 319.

Palmer *v*. Cross et al.

1 Johns. R. 512.  4 Ib. 70.  5 Ib. 272.  5 Vesey, 688, *Jackson* v. *Carter*.  And the rule applies to all manner of creditors.  See statute of conveyances, Rev. Code, 452; where the whole class of constructive frauds are repeatedly declared void as to "all creditors."

4.  So averse is a court of equity to this class of frauds, that no disability whatever prevents the full and vigorous operation of the rule.  "Neither infancy or coverture, shall be an excuse in such a case."  Fonblanque, Eq. b. 1, Ch. 3, § 4, p. 136.  1 Story's Eq. § 385.  9 Mad. 35.  2 Eq. Abridgt. 489.  *Cave* v. *Earl Bedford*, cited 2 Vernon, 150.  Ib. 151.  Bro. Ch. 357. *Evans* v. *Bicknell*, 6 Ves. Jr. 180.

5.  The rule applies where the party is ignorant of his title. For, say the authorities, "There are, indeed, cases where ignorance of title will not excuse a party; for if he actually mislead a purchaser by his misrepresentations, though innocently, the maxim is justly applied to him, That where one of two innocent persons must suffer, he shall suffer, who, by his own acts, occasioned the confidence and the loss."  1 Story's Eq. 387. *Neville* 'v. *Wilkinson*. 1 Bro ch. R. 436.  3 Peere Williams, 74. Coxe's note, *Scott* v. *Scate*, 1 Coxe's R. 378, 379, 380.  *Evans* v. *Bicknell*, 6 Ves. 172, 182, 184.  *Pearson* v. *Morgan*, 2 Bro. Ch. R. 388.

6.  But we say that the deed under which the complainants claim is void on its face, taken into connection with the testimony.  It purports to convey property, admitted to be Oliver Cross's.  Ann Michie undertakes to convey property, that it shows was the property of Oliver Cross; and to avoid this, it asserts that she had bought it from him the November previous.  Now, when she was making the deed, the Old Commonwealth, beholding demanded why she was conveying to Mrs. Ann Cross the negroes of Oliver Cross; she replied, that she had bought them the November previous.  Say you so, Mrs. Ann Michie?  If so, it behooves you and those who claim under you, to prove it.  You cannot thus convey property with these suspicions—suspicions so glaring, that you felt constrained to attempt, at least, an explanation—without proving a *bona fide*

title for valuable consideration. And here we beg it always and distinctly understood, that we claim nothing under this deed. It was learnedly, however inapplicably, remarked by the vice chancellor, in deciding this cause against us, that we could not take one part of the deed and reject another. As if we took any part of it, or claimed under it, or admitted it in any portion of it. We are resisting and rejecting it in its entirety, and all its parts constituting the entirety. They, the complainants, claim under the deed, (not we,) and they must support it in every particular, (see 4 Watts Rep. 359,) in its execution, in its fairness, in its consideration and whatever else, if any thing, that is necessary to its validity. And not to excuse the suspicious portions of it from the imputation of fraud, by telling us if we take a part of it we must take the whole. We hurl this back upon them, and say to the complainants, if you take under the whole, you must take under all its parts. And you cannot relieve yourself from its fraudulent character, glaringly apparent in the recitals, by coolly telling us that the demising portion is sound, and sufficient to convey the property. They are bound by the recitals, not we. They are bound by the whole deed, and all its parts; not Palmer, or the creditors of Oliver Cross.

7. Again, we lay it down as the law governing this whole case, that all property after its acquisition is held upon condition. The condition is, that the party claiming it do everything the law requires to perpetuate the title; or, that the party omit nothing that is required of him by law for its preservation to him. And as a corollory from this principle, we lay it down, that whenever any persons remove into this State, bringing any species of property with them, thenceforward they hold such property upon the conditions that citizens of the State hold property of the same kind. No more, no less. To argue otherwise, would be to confound and confuse title to the extent of the twenty-six jurisdictions of the Union, superadding thereto all the foreign governments of the earth. It would be to say, that if a Turk become a citizen of this State, he should not hold his property subject to the conditions and requirements that our laws impose and demand; but that if he did those things

that would have perpetuated the property to him in Turkey, that it shall be and remain his upon a fulfilment of the Turkish requirement, though such requirement might be such a flagrant violation of our laws as to amount to a forfeiture. Such a position is grossly absurd.

Apply these principles to the case before the court. The complainants claim under a deed of trust made in the State of Virginia, and they remove the property into this State. A citizen of the State, if he remove from one county to another, holding property as these complainants claim this, must have his deed recorded in the county into which he removed within twelve months from such removal. And if he do not, he forfeits the property to purchasers and ALL CREDITORS, without notice. Are Ann Cross and these complainants bound by this law? If not, by what rule, and what is the reason of it? Can the complainants, because they come from Virginia, hold property free from the demands of creditors, under such circumstances of fraud as would cause a forfeiture of property, if perpetrated by a citizen of the State? Why is that, which, if done by a citizen, is a gross fraud forfeiting the estate to a creditor so imposed on, harmless if perpetrated by a Virginian? What sanctity is there in Virginia soil, character, or deeds thus creating and upholding so high and exclusive a privilege? If there can be any reason given of law, morals, or in the nature of things, for such a distinction, I would be glad to hear it. It is idle to talk about the property vesting in Virginia. So far as this point of the case is concerned, the question is not about the vesting, but the divesting the estate, for that character of fraud which the statute holds so odious as to forfeit the estate to creditors for its perpetration. (Rev. Code, 452, § 3, 4, 5, and How. & Hutch. 193, § 3, Statute of Frauds, and the authorities cited in the third and fourth points of this Brief.) Such a construction—no! such an infringement of the statute, tolerated by a judicial sanction, would at once repeal the Registry Acts, and let in all that flood of positive and constructive fraud that they were designed, in advance, to obviate—especially in a country so populated by emigrants from other States as ours is. Such a decision would at once

unhinge the legal landmarks of property. And it would create inextricable confusion in the legal tenures and duties by which property is held. A Virginian, for instance, so long as he conformed to and practiced the duties imposed by the institutions of that State, would be secure in the enjoyment of his estate, though such practices may be such gross infractions of our own laws and policy as would work an instant forfeiture if a citizen conformed to them.

Such cannot be the law. If it were, it would create the same confusion in titles, the same eternal complexity in judicial proceedings, and indeed it would be equivalent to the same thing as the enacting of a statute that the rights of property of each emigrant into the State should be regulated, controlled, held and enjoyed, not by the laws and policy of Mississippi, but by the laws and usages of the State from whence the individual came. And the consequence would be, that our registry laws and statute of frauds and perjuries, would be of no practical utility to the citizen—indeed, they would be but the instruments and landmarks whereby the foreigner could, with unerring certainty, defraud the citizen without any compensating advantage whatever to him. Such a construction of our statute is not only ridiculous and absurd, but it is really wicked. Then as a conclusion, we confidently affirm, that, as these complainants have not complied with the condition upon which they held, or could have held, this property free from the claims of creditors, ("all creditors,") that they have forfeited all interest in it that is in any wise adverse to any creditor of Oliver Cross.

8. But we say this deed was not valid, and no property vested by it, even in Virginia. Instead of this being so, it was in fact fraudulent and void as to "all creditors" in that State. Why? Because the statute of Virginia made it so unless it were recorded in eight months from its sealing and delivery.

This deed was executed the 17th March, 1808, and acknowledged for record the 11th September, 1809. Instead of being recorded in eight months, so as to protect it against creditors, it was not recorded for one year and three months. So that it was,

even in Virginia, a fraudulent and void deed.   Where now is its efficacy?   But a moment ago, all its sacredness and efficacy were derived from a compliance with the laws of Virginia. Now it seems that under these it was fraudulent and void; and as they never have pretended to record it in this State, every pretence of claim is swept from under them.   This deed being void as to creditors from the beginning, it is unnecessary to go into the doctrine of void and voidable deeds.   For if void, it was incapable of confirmation by the respondent—if only voidable, it is not pretended that he ever ratified, but this proceeding is resorted to, to compel him to do so in effect.   See Rev. Code of Virginia, 1 vol. c. 90, § 4, act 1792: and see *Moore's executors* v. *Auditor*, 3 Henning & Munford, 232, where a deed not proved, or acknowledged and recorded as the act provides, is declared void as to all creditors.   And it is worthy of remark, that this decision was made the very year (1808) this deed of trust was made.

9.  And in conclusion, the following circumstances are shown in support of the position that the deed in its inception was fraudulent: and

1.  The recital that the negroes assumed to be conveyed to Ann Cross, were the property of her husband, " being the same purchased by me in November last, of Oliver Cross," when there is no proof of sale, consideration, or change of possession from Oliver Cross to Ann Michie, who pretends to convey to Ann Cross under this recital.

2.  In confirmation of the supposition that no change of possession did take place, we have the deposition of Dickenson Wash and his wife;—he proving he had known the property twenty-five or thirty years previous to 1835, (the year Oliver Cross left Virginia,) and the possession of it was always with Oliver Cross.   If he knew it but twenty-five years, his knowledge extends only fourteen months after the pretended sale; if he knew it thirty years, it extends three years and ten months beyond the sale.   Now let us see which is right.   His wife says this knowledge has been for more than thirty years.   David Michie has known it twenty or thirty years.   So upon this point

the proof is clear there never was any change of possession from Oliver Cross to Ann Michie, who pretends to convey to Ann Cross.

3. And next in order is the fact of her being present when Palmer and Eskridge were appraising these negroes for stock in the Northern Bank, and not only admitting the title of Cross to them, but encouraging him to put in three or four others, he said he could not make a title to, because they were hers.

4. Her taking the oath that required her to have an appraisement of the estate of Cross, (Rev. Code, 44, § 56,) and having this property appraised, in her presence, at her house—so is the proof—as part of the estate.

5. Her receiving that appraisement, and returning it as her duty was, (see Rev. Code, p. 49, § 75,) into the probate court, with these slaves included. This combination of circumstances, marking, successively, a period of thirty-two or thirty-three years, amount, in my opinion, to a moral demonstration, that this claim is fraudulent—as the deed was in its inception.

6. Joining with Palmer in a petition for the sale of the estate of Cross.

*Sheppard,* for appellees.

The Virginia title or right to the slaves in controversy, acquired under the laws of that State, has not been questioned by appellant. The deed and will of Mrs. Michie, by which she has given the slaves and their increase to her daughter, Ann Cross, and her children, were duly recorded in Louisa county, Virginia, in compliance with the acts of registration of that State. The construction which the court of appeals of Virginia have given to their statute of frauds of 1785, enables the parties to record their deed at any time within five years. See *Beasley* v. *Owen*, 3 Hen. & Mun. Rep. Also *Farquarson* v. *White*, 3 Marshall Rep. 6. The slaves were conveyed in strict settlement; the legal title vested in trustees for the separate use and benefit of Mrs. Cross, during her life, restricting her right of disposition as to the property, remainder over at her death to her children, in fee.

The averments of the bill, as to the identity and increase of the slaves, have not been controverted or denied, and have been sustained by the fullest proofs.

The slaves remained with appellees, in the State of Virginia, until the autumn of the year 1836, at which time they were removed with appellees, to this State.

There is no error in the decree rendered in the court below.

1. The answer of defendant presents no matter on which the court could decree or direct that this property should be appropriated in payment of Oliver Cross's debts. The answer contains much irrelevant matter, and, as we conceive, simply puts complainants upon proof of their title. It is alleged in avoidance of title of appellees, that the defendant and others, who were creditors at large of Oliver Cross, had no notice of their claim of title. It cannot, we conceive, be sustained as a correct legal proposition, that it was the duty of Mrs. Cross to give notice of her title to the various persons from whom her husband may have obtained credit, and as she was not bound to speak, she will not be prejudiced, having remained silent. Such a duty imposed on a wife would conflict with the quiet and harmony of the nuptial relation, and would, in effect, be requiring the wife to publish to the community, that her husband was designing to defraud them.

This is not the case of a person standing by and remaining silent where a third party is purchasing or taking a specific lien upon their estate—but it is attempted to avoid the title of complainants in favor of creditors at large, on account of this general silence as to their claim. Such a proposition cannot be sustained.

In case of *Bank of United States* v. *Elizabeth* et al. 13 Peters' Rep. a deed of trust had been executed on the separate estate of Mrs. Lee, by her husband, which, in this respect, is much stronger than the case at bar, yet Judge Catron held that though Mrs. Lee was silent as to her title generally, and had knowledge that her husband was obtaining credit on the faith of her property, yet a court of chancery could not hold her responsible for her silence.

2. It is said that this deed and will were not recorded in this State in compliance with our statute of registration. There is no such averment in the answer, nor does it appear, from the proof, that there was no such registration. We apprehend, therefore, that this point cannot properly be raised in this case. But if the question had been made, there is no provision in our statute requiring the registration of the deed under which appellees derive title.

The act of assembly of this State, regulating the conveyances of property and the registration of deeds, How. & Hutch. 343, declares the deed void unless acknowledged, proved, and recorded, in compliance with its provisions, and prohibits the recording of a deed unless acknowledged and proved as therein directed. This statute could not effect the Virginia title of appellees, completely vested long prior to its passage, according to the provisions of the *lex loci contractus.* From the language of the statute, it is manifest that it was prospective in its operations, and was intended to operate on conveyances only made in this State ; for if a different construction were given to it, many cases might arise in which it would be impossible to comply with its provisions—for example, suppose the case of a deed of trust on personal estate, executed in another State, acknowledged by the grantor before a clerk of a court in such State, authorized to take such acknowledgements, and without subscribing witnesses, such a deed could not be received for record in this State under the act above referred to; yet by the law of the place of the contract, a title has been vested. The policy of the statute is clear; it was designed to avoid the deed only in favor of purchasers from, and creditors of, the grantor. If the deed be declared void under the statute, the creditors of Oliver Cross, or his wife, could acquire no right unless there was vested in their debtor a title paramount to that of the grantor. See case of *Morgan* v. *Elam*, 4 Yerg. Rep. *Land* v. *Jeffries*, 5 Randolph Rep. *Pearce* v. *Turner*, 5 Cranch Rep.

The case at bar does not come within the provisions of the 4th section of the act, for the property has remained in the possession of Mrs. Cross, and though by the nuptial relation Oliver

Cross may have had the apparent possession, yet the beneficial interest and title being vested in Mrs. Cross, in legal intendment it was her possession.   Lady Arundel's case, 10 Ves. 150, and authorities above cited.

3. It is attempted to subject the property under the provisions of our statute of funds.  How. & Hutch. 370.

The 2d section of this act is similar in its provisions to the statute of 1785 of Virginia, and the statutes of 1801 of Tennessee.   In case of *Crenshaw* v. *Anthony*, Martin & Yerg. Rep. Judge Catron held that a deed executed under the statute of 1775 of Virginia, could not be operated on, or effected by the statute of 1801 of Tennessee, although the deed had never been recorded in the latter State; and we would refer the court to the opinion of Judge Catron, as containing an able exposition of the principles of law, arising on the case at bar.

It is not averred that there was a pretended loan of the slaves to Oliver Cross, or that possession remained with him in this State for the space of three years without demand made, and this is the only ground on which the statute could affect a title obtained even under the laws of this State.   But, on the contrary, it appears that possession could not have remained with him in this State more than one or two years, for the slaves were removed from Virginia to this State in autumn of 1836, and he must have died shortly after his removal here, for in 1838 his will was probated and admitted to record.

The appellees have made out a perfect and complete title, and no matter has been presented by the defendant, which could defeat or bar their right; and from the view of the case which we have taken, we conceive that the decree should be affirmed.

Mr. Justice CLAYTON delivered the opinion of the court.

In the year 1808, Ann Michie, of Louisa county, Virginia, executed a deed by which she settled upon her daughter, Ann Cross, one of the complainants, certain slaves to her separate use and benefit during her life, and after her death to her children. This deed was recorded in Louisa, in which county the parties all resided, about eighteen months after the deed was executed.

They continued their residence at the same place, until the year 1835, when it seems they moved to Tennessee, and in 1836 to the county of Carroll in this State. Oliver Cross, the husband of Ann and the father of the other complainants, died in 1838. His estate, apart from the slaves settled upon Mrs. Cross by the deed of Mrs. Michie, and from some other slaves which were bequeathed by Mrs. Michie with similar limitations, was insufficient to pay his debts. Palmer was one of his creditors and one of the administrators, and he was proceeding under an order of the probate court, to sell the slaves embraced in the deed and will of Mrs. Michie, to pay off the debts. This bill was filed by Mrs. Cross and her children to enjoin the sale, and to set up their rights to the slaves. The will was proven and recorded in Louisa county, Virgina, but neither the deed nor the will had been recorded in this State at the time the bill was filed. The cause was heard in the vice chancery court at Carrollton, the injunction was made perpetual, and an appeal taken to this court.

The deed of Mrs. Michie was one which, by the laws of Virginia, she was permitted to make. Its provisions do not come in conflict with the statutes or policy of that State, and numerous settlements of a similar character have been carried into effect there. The fact that the deed was not recorded for some eighteen months after its execution, can have no weight in this controversey. The statutes of Virginia, by which the legality of the registration in that State must be tested, enact that all deeds of trust and mortgages shall take effect from the time they are delivered to the clerk to be recorded; and all other conveyances, covenants, agreements and deeds shall take effect from their date if proven, or acknowledged and delivered to the clerk for recording in eight months from the time of their execution, but if not so delivered within eight months, they take effect and become valid, as to all subsequent purchasers, for valuable consideration, without notice, and as to all creditors, from the time when acknowledged, or proven and delivered to the clerk of the proper court to be recorded. Tate's Dig. 101. This deed, there-

fore, became good in the year 1809, when it was recorded, a period long antecedent to the origin of the debt of the appellant.

Neither will the statute of frauds of Virginia vary the result. The clause in that statute in regard to the loan or limitation of property, where the possession is severed from the title, was first passed in 1785, and introduced a provision not included in the English statutes of frauds. It has been followed in several of the other states, and it is the prototype of the clause on the same subject in ours, with few distinctive features, except that the time is five years, instead of three as with us. There the courts have decided that the making and recording of the conveyance need not be coeval with the transaction; if it be recorded at any time within five years, the title of those claiming under the deed will be protected against the creditors of the party in possession. *Beasley* v. *Owen*, 3 H. & M. 449. In other words, five years possession will create a title in the possessor, which will enure to the benefit of creditors and purchasers, unless the deed creating the loan or limitation be *within that* time recorded. According to the decisions, the time of eight months, which is limited for recording deeds mentioned in the preceding clause of the statute, does not apply to this clause, and it is holden to be sufficient to record the deed within the five years. In this instance the deed was recorded within eighteen months, and it falls within the principle just adverted to.

The same rule has been adopted in this State. *Mosby* v. *Williams*, 5 How. 520. The court in that case held that "the party making a loan is allowed three years to make a record of it."

Having shown that the title of Mrs. Cross, to the slaves conveyed in the deed, was valid in Virginia, the inquiry arises, whether her rights are the same here? Is there any law of this State, either of registration or of any other character, which precludes the enforcing of their claim?

One of the laws for which this effect is claimed in argument, is the fourth section of the act of 1822, in regard to conveyances. H. & H. 344. That clause enacts "That every deed respecting the title of personal property hereafter executed, which by law ought to be recorded, shall be recorded in the court of that

county in which such property shall remain;" it then goes on
to provide for the recording of the deed in a different county, in
case the property be removed. Now the deed under which this
controversy arises, was executed before the passage of the law,
and is, by the terms of the law, excluded from its operation. It
is also manifest that this section only contemplates deeds which
were executed for personal property within this State at the time
of making the conveyance, and its subsequent removal from one
county to another within the limits of this State. Without
some statutory provision, registration of titles to personal prop-
erty is not required; and it would be judicial legislation for the
court to require a class of instruments to be recorded in regard
to which the statutes have made no such requisition. This
point has already been decided, by several of the most respect-
able courts in the Union, in accordance with the views here
expressed. *Crenshaw* v. *Anthony*, Mar. & Yer. 102. *Loving*
v. *Hunter*, 8 Yer. 4. *Forsyth* v. *Kreakbaum*, 7 Monroe, 99.
*Smith* v. *Burch*, 3 Har. & Johns.; and *Bank of U. S.* v. *Lee* et
al. 13 Peters, 107. The tenor of these cases is uniform, that if
the deed be recorded in the State where it is executed, according
to the laws in force there, it is sufficient, unless the statutes of
the State, into which the property may be removed, by express
provision require such deeds to be registered within its limits.
In this State we have none such.

It has also been insisted that the statute of frauds operates
on the case. We are of a different opinion. At the time this
controversy commenced, neither Oliver Cross nor any one for
him, had held the slaves for three years in this State. It has
already been decided by this court, that the statute will not at-
tach, unless the possession has been continued for three years in
this State. *Mosby* v. *Williams*, ut supra.

This disposes of the main points in the cause; but one or
two others have been urged in argument, which should not be
passed over without notice. It is said it nowhere appears that
Mrs. Michie had any right to make the settlement upon Mrs.
Cross, inasmuch as the deed recites that she had purchased the
slaves of Oliver Cross, the husband. That recital is the only

evidence in the cause, that Oliver Cross ever owned the negroes in his own right. That recital must be taken altogether, not one part dissevered from the context; and the same clause which states the fact of the former ownership, also states the purchase. No room is therefore afforded for reasonable doubt; and no attempt has been made to prove the recital false.

Again it is urged that Ann Cross was silent on the subject of her title, and that she, on one occasion, suffered a part of the slaves to be valued, with a view to the taking of stock in the Northern Bank, upon a mortgage of the slaves. This occurred in her presence, and without objection on her part. Her husband was also present. Her conduct could not, under any circumstances, prejudice the rights of her co-complainants, who hold the interest in remainder, after the termination of her life estate. The law has thrown certain guards around a married woman to protect her from the influence of her husband. It has provided a mode by which alone she can be divested of her real estate; and to use no stronger language, it is certainly very doubtful whether she can be deprived of her separate personal estate in any other mode than the one prescribed by the instrument of settlement. The supreme court of the United States, in the case already cited from 13 Peters, p. 107, decided that the mere silence of Mrs. Lee, as to her title, and her failure to obtrude her rights upon the notice of others, could not divest her of her property. Without undertaking to say that the conduct of a married woman may not be so fraudulent as to destroy her rights in some cases, we do not believe that this is a case of that kind. See *Wilks* v. *Fitzpatrick*, 1 Humphreys, 58. 2 Mer. 483.

In the sequel it may be proper to remark that we do not mean to anticipate the decision of the point, whether the lapse of three years, without recording the deed in this State, would transfer the title to the possession. That is left to be determined when the case may arise.

The property secured to Mrs. Cross by the will of her mother, is equally protected with the other.

Had Oliver Cross retained possession of the slaves in Virginia

for more than five years, without any record of the deed, the result might have been different.   This is said with a full recollection of the case of *Mosby* v. *Williams*, before cited; which, upon this point, may deserve a careful review.   The gift or loan in the case of *Fitzhugh* v. *Anderson*, 2 H. & M. cited in the opinion of the court, was made prior to the passage of the Virginia Statute of Frauds, and the decision is different from those which have since been made.   See *Gay* v. *Moseley*, 2 Mun. 543.   *Garth* v. *Barksdale*, 5 Mun.   But on this we give no authoritative opinion, because the facts do not call for it.

On the whole, we see no error in the decree of the court below, and we therefore direct it to be affirmed.